## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Criminal Action No. 22-cr-00202-RM-2

UNITED STATES OF AMERICA,

      Plaintiff,

v.

2.    JAMES ALBERT WITTE,

      Defendant.

---

## PLEA AGREEMENT

---

The United States of America (the government), by and through Martha A. Paluch, Assistant United States Attorney for the District of Colorado, and the defendant, JAMES ALBERT WITTE, personally and by counsel, Martha H. Eskesen, Esq., submit the following Plea Agreement pursuant to D.C.COLO.LCrR 11.1.  This agreement binds only the Criminal Division of the United States Attorney's Office for the District of Colorado and the defendant.

### I.    AGREEMENT

### A. Defendant's Plea of Guilty:

The defendant agrees to:

(1)    plead guilty to Count 1 of the Superseding Indictment charging a violation of Title 18, United States Code, Section 1956(h) and 1956(a)(1)(B)(i), Money Laundering Conspiracy (Concealment);

(2)    waive certain appellate and collateral attack rights, as explained in detail below;

(3)    agree that the loss amount for purposes of the guideline calculation is more than $550,000, but less than $1.5 million;

Court Exhibit

1

(3)  be liable for restitution to the victims.  In advance of the sentencing hearing, the parties will provide the exact amount due to each victim to the Court and probation.  Any such amount should be ordered joint and several  with any of the defendant's co-conspirators convicted in this case; and

(4)  agree not to contest forfeiture as more fully described below.

## B. Government's Obligations:

This agreement is made pursuant to Fed.R.Crim.P.11(c)(1)(A). The government agrees to move to dismiss Counts 2-5 of the Superseding Indictment with prejudice, against this defendant only.  Should the plea of guilty be vacated on the motion of the defendant, the government may, in its sole discretion, move to reinstate any or all of the counts dismissed pursuant to this agreement and potentially file a second superseding indictment.

Provided the defendant does not engage in prohibited conduct or otherwise implicate USSG §§ 3C1.1 and 3E1.1, cmt. n.4 between the guilty plea and sentencing in this case, the government agrees that the defendant should receive a two-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(a) and agrees to file a motion requesting that the defendant receive a one-level reduction for acceptance of responsibility pursuant to USSG § 3E1.1(b).

The government agrees to recommend a sentence at the low-end of the applicable guideline range for the criminal history and the total offense level calculated by the Court at sentencing.  The defendant is free to file a motion for departure and/or variance.

## C. Defendant's Waiver of Appeal

The defendant is aware that 18 U.S.C. § 3742 affords the right to appeal the sentence, including the manner in which that sentence is determined. Understanding

this, and in exchange for the concessions made by the government in this agreement, the defendant knowingly and voluntarily waives the right to appeal any matter in connection with this prosecution, conviction, or sentence (including the restitution order), unless it meets one of the following criteria:

(1)    the sentence exceeds the maximum sentence provided in the statute of conviction, 18 U.S.C. § 1956(h), 1956(a)(1)(B)(i);

(2)    the sentence exceeds the top end of the advisory guideline range from the Sentencing Guidelines that applies for the defendant's criminal history (as determined by the district court) at a total offense level of **21**; or

(3)    the government appeals the sentence imposed.

If the first criteria applies, the defendant may appeal only the issue of how his sentence exceeds the statutory maximum sentence.  But if one of the latter two criteria apply, the defendant may appeal on any ground that is properly available in an appeal that follows a guilty plea.

The defendant also knowingly and voluntarily waives the right to challenge this prosecution, conviction, or sentence (including the restitution order) in any collateral attack (including, but not limited to, a motion brought under 28 U.S.C. § 2255). This waiver provision does not prevent the defendant from seeking relief otherwise available in a collateral attack on any of the following grounds:

(1)    the defendant should receive the benefit of an explicitly retroactive change in the sentencing guidelines or sentencing statute;

(2)    the defendant was deprived of the effective assistance of counsel; or

(3)    the defendant was prejudiced by prosecutorial misconduct.

The defendant also waives the right to appeal any sentence imposed below or within the Guideline range upon a revocation of supervised release in this case number, except where the defendant unsuccessfully objects to the grade of violation applied by

the court during the district court revocation proceedings.  In that event, this waiver does not apply and the defendant may appeal the sentence imposed upon a revocation of supervised release, even if that sentence falls below or within the guideline range calculated by the court.

The defendant also waives the right to appeal the denial of any motion filed under 18 U.S.C. § 3582(c)(1)(A) where such denial rests in any part upon the court's determination that a sentence reduction is not warranted under the factors set forth in 18 U.S.C. § 3553(a). This waiver does not apply to an appeal of a denied § 3582(c)(1)(A)(i) motion where the district court, in denying the motion on § 3553(a) grounds, failed to consider the facts allegedly establishing extraordinary and compelling circumstances as part of its § 3553(a) analysis.

**D. Forfeiture of assets**:

The defendant admits the forfeiture allegations. The defendant further agrees to forfeit to the United States immediately and voluntarily  any and all assets and property, or portions thereof, subject to forfeiture, pursuant to Title 18, United States Code, Section 982(a)(1) whether in the possession or control of the United States, the defendant, the defendant's nominees, or elsewhere.  The assets to be forfeited specifically include but are not limited to: a money judgment in the amount of the proceeds obtained by the conspiracy.  The defendant agrees and consents to the forfeiture of these assets pursuant to any federal criminal, civil, and/or administrative forfeiture action.   The defendant understands that pursuant to 18 U.S.C. § 983, the seizing agency is required to send notice in non-judicial civil forfeiture matters.  Having

been advised of said rights regarding notice, the defendant hereby knowingly and voluntarily waives his rights to notice being sent within the time frames in 18 U.S.C. § 983 and to having the property returned to him if notice is not sent within the prescribed time frames. The defendant further agrees to the forfeiture of any substitute assets up to the value of any property described above pursuant to 21 U.S.C. § 853(p) and Federal Rules of Criminal Procedure 32.2(e).

Forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty this Court may impose upon the defendant in addition to forfeiture.

The United States Attorney's Office for the District of Colorado will recommend to the Attorney General that any net proceeds derived from the sale of the judicially forfeited assets be remitted or restored to eligible victims of the offense[s], for which the defendant has pleaded guilty, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. pt. 9, and any other applicable laws, if the legal requirements for recommendation are met. The defendant understands that the United States Attorney's Office only has authority to recommend such relief and that the final decision of whether to grant relief rests solely with the Department of Justice, which will make its decision in accordance with applicable law.

## II.    ELEMENTS OF THE OFFENSE

The parties agree that the elements of Count 1, a violation of Title 18, United States Code, Section 1956(h), Money Laundering Conspiracy, are as follows:

- *First:* the defendant agreed with at least one other person to commit money laundering in violation of 18 U.S.C. Section 1956(a)(1)(B)(i) (Concealment);
- *Second:* the defendant knew the essential objective of the conspiracy.
- *Third:* the defendant knowingly and voluntarily participated in the conspiracy.
- *Fourth:* there was interdependence among the members of the conspiracy; that is, the members, in some way or manner, intended to act together for their shared mutual benefit within the scope of the conspiracy charged.

*Tenth Circuit Pattern Jury Instructions for Conspiracy,* § 2.19 (2021)(modified)(no 10th Circuit Pattern); *see* 18 U.S.C. § 1956(h); *United States v. Keck,* 643 F.3d 789, 794 (10th Cir. 2011); *United States v. Fishman,* 645 F.3d 1175, 1187 (10th Cir. 2011); *Whitfield v. United States,* 543 U.S. 209, 215-216 (2005) (there is no overt act requirement for a 1956(h) conspiracy).

The parties agree that the elements of the object of the conspiracy, Money Laundering (Concealing Illegal Proceeds), a violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), are as follows:

- *First:* the defendant conducted a financial transaction;
- *Second:* the transaction involved the proceeds of mail fraud;
- *Third:* the defendant knew that the property involved in the financial transaction represented the proceeds of some form of unlawful activity; and

- *Fourth*: the defendant conducted the financial transaction knowing it was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds of unlawful activity.

*See* 10th Cir. Crim. J.I. § 2.73.1, *United States v. Gonzalez,* 918 F.3d 808, 812 (10th Cir. 2019).

### III.    STATUTORY MAXIMUM SENTENCE

The maximum sentence for a violation of Count 1 of the Superseding Indictment is: not more than 20 years' imprisonment; not more than three years of supervised release; maximum fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or both fine and imprisonment; $100 mandatory victim's fund assessment fee; and restitution.

### IV.    COLLATERAL CONSEQUENCES

The conviction may cause the loss of civil rights, including, but not limited to, the rights to possess firearms, vote, hold elected office, and sit on a jury.

### V.    STIPULATION OF FACTS

The factual basis for this plea is set forth below. Because the Court must, as part of its sentencing methodology, compute the advisory guideline range for the offense of conviction, consider relevant conduct, and consider the other factors set forth in 18 U.S.C. § 3553, additional facts may be included below which are pertinent to those considerations and computations. To the extent the parties disagree about the facts set forth below, the stipulation of facts identifies which facts are known to be in dispute at the time of the execution of the plea agreement.

This stipulation of facts does not preclude either party from presenting non-contradictory additional facts which are relevant to the Court's guideline computation, to other 18 U.S.C. § 3553 factors, or to the Court's overall sentencing decision.

The parties agree that there is a factual basis for the guilty plea the defendant will tender pursuant to this agreement.  The parties further agree that the date on which relevant conduct began is January 2020.  The factual basis is set forth below.

. This conspiracy involved laundering the proceeds from a government official imposter scheme.  The scheme operated as follows:

Victims were contacted by phone and coerced into believing that they were under investigation by "Agents" of the FBI, SSA, DHS, Treasury, or U.S. Drug Enforcement Administration (DEA).  Often the victims were told that their arrest and/or deportation from the United States had been ordered by law enforcement and was imminent, and the only way to avoid arrest was to pay the "Government" large sums of money as instructed.

In a typical scenario, the "Agent" informed a victim that their identity had been connected to a criminal incident and instructed the victim to remain on the phone for the duration of the call while the victim traveled to their bank to withdraw cash (U.S. Currency), financial transactions for purposes of 18 U.S.C. § 1956(c)(4)(A)(i).  The "Agent" then convinced the victim to package the cash in a specific manner and ship the cash to an alleged government official via Federal Express (FedEx) or United Parcel Service (UPS), both interstate commercial carriers.   The victims were told their money would remain in "trust" until the matter could be sorted out.  The victims reported that

they believed they were speaking to legitimate U.S. Government officials and that paying the fees would alleviate their alleged criminal liability.

The identities of the individuals who made these calls to the victims is unknown to the government. The defendant maintains, and the government cannot disprove, that the defendant did not make any of these calls.

To date, the investigation has identified a number of individuals nationwide, referred to as "runners," whose role in the scheme was to receive the cash sent from the defrauded victims. Three runners were charged in this prosecution: Dhruv Jani ("Jani"), an Indian national, the defendant James Albert Witte ("the defendant"), a U.S. Citizen, and Jason Lee Henderson ("Henderson"), a U.S. Citizen. At the time of the events described below, all three defendants were residing in Wray, Colorado.

Jani coordinated the receipt and pickup of packages and operated in a management role overseeing the defendant and later, Henderson, who both used various fraudulent identity documents to pick up the packages. Jani was involved in securing these fraudulent identity documents for the defendant and Henderson.

Fifty-seven victims of this scheme who mailed packages to Colorado have been identified. These victims provided the names of the "government agents" to whom they were directed to mail packages of cash and the manner of shipping (FedEx or UPS). Shipment records reflect in almost all incidents the packages were delivered to Walgreens stores in Northern Colorado (Sterling, Wray, Greeley, Loveland, Fort Collins, Fort Morgan, and a few in Denver). Video surveillance from these stores and text messages from the defendant's and Henderson's phones tied them to specific fake identification cards used to pick up the packages.

On November 4, 2020, a package shipped via UPS to an individual in Sterling named "Joe Airem" was interdicted at the local UPS shipping hub.  The package, which contained U.S. Currency, was sent to "Airem" by a victim of the government impersonation scam from University Place, Washington with the initials D.A.

When "Joe Airem" attempted to retrieve the package from a UPS store in Sterling, Colorado, the clerk became suspicious of "Airem" and refused to relinquish the package.  When "Airem" exited the store, the clerk contacted the Sterling Police Department who initiated a traffic stop of a vehicle driven by the defendant.

The defendant consented to a search of his vehicle, which turned up nothing. During the stop, the defendant allowed law enforcement to view his phone which revealed communications between he and an individual named 'Kal Jani' for whom the defendant claimed to be picking up the package.

Law enforcement subsequently identified 'Kal Jani' as Dhruv Jani ("Jani"), a B1/B2 Non-Immigrant Visa holder from India.

The defendant subsequently waived his Miranda rights and consented to an interview with law enforcement at the Sterling Police Department.  During the defendant's interview, the defendant admitted to the following:

The defendant stated that Jani worked at a 7/11 store in Wray, Colorado and that the defendant had known Jani for years.  The defendant stated he entered into a business agreement with Jani in 2020 after closing his restaurant in Wray.  Jani provided the defendant with fake identity documents and then directed the defendant to pick up packages containing U.S. Currency from UPS and FedEx locations (typically inside Walgreen's stores) using the fake IDs.  The defendant and Jani would travel to

the Walgreen's stores and Jani would stay in the car while the defendant would pick up the packages of cash.

The defendant claimed that he was paid $200 from each package he picked up and turned the rest over to Jani. The defendant claimed not to know what Jani did with the money that the defendant gave him.

The defendant confirmed his use of several fake IDs to pick up packages to include the names "Jacob Hicks," "Andrew Pwesei," and "Joe Airem," and that Jani directed him to return the IDs after they had been used several times. The defendant stated he was not involved in picking up packages from the end of August 2020 through the end of September 2020. The government agrees the evidence supports this assertion.

During his interview with law enforcement, the defendant identified his and Jani's involvement in the scheme. Initially the defendant told law enforcement that he believed the packages contained drug money. The defendant later clarified he said this because he was nervous and didn't know what else to say concerning the source of the money. After his arrest, in a text message to Jani, the defendant stated he knew the cash in the packages was "stolen." The defendant subsequently reported to law enforcement that when he asked Jani where the money in the packages came from, Jani responded, "You don't want to know." The buying and selling of drugs were never an aspect of the defendant's relationship with Jani such that the defendant would have any reason to believe the packages contained drug money. Law enforcement's investigation confirms that drug trafficking was not part of the charged conspiracy.

The defendant reported that Jani told him that they could not deposit cash from the packages into the bank accounts of third parties, so it was necessary to purchase money orders and deposit those into the accounts of others, therefore comprising financial transactions for purposes of 18 U.S.C. § 1956(c)(4)(A)(i).  Both Jani and the defendant purchased money orders.  The defendant admitted that he and Jani purchased money orders using their true names and fake IDs at 7/11s at various stores. Jani instructed the defendant on the number and denomination of money orders to purchase.  After purchasing the money orders, Jani and the defendant would return to their car and Jani would place the money orders in a zippered bank bag and stockpile them at home until Jani received instructions about where to deposit them.  Jani filled out and signed the majority of the deposit slips for the money orders and made the deposits himself.

The scope of the conspiracy charged in the Superseding Indictment was to use fake IDs to pick up packages of cash, purchase money orders, and deposit those money orders into third-party accounts.  The defendant and Henderson operated at the direction of Jani but independently of each other and at different periods of time.

The 57 victims mailed, or attempted to mail,[1] approximately $1.6 million to the defendants in Colorado.[2]  Many of these same victims were also directed to mail

---

[1] The attempted deliveries are comprised of deliveries not completed due to 1) the sender requested the package be returned prior to it being picked up; 2) law enforcement intercepted the package; 3) the package was redirected by the scammer(s) from Colorado to another state; or 4) significant steps were taken to send the package as directed but the package was ultimately not sent. The amount of money in attempted deliveries in this case is approximately $410,000.

[2] These victims are also out shipping expenses for the mailing of these packages to Colorado, which amount will be included in the loss and restitution calculations.

packages of cash to individuals in other states.  All told, the victims who sent money to Colorado and to other states are out over $7.5 million from the government official imposter scheme.

The parties agree that as to the mailing of packages of cash to other states, those mailings were not 1) within the scope of the jointly undertaken criminal activity in this case, and therefore, were not 2) in furtherance of that activity and were not 3) reasonably foreseeable in connection with that criminal activity.  For these reasons, the parties submit that the entire $7.5 million is not attributable to this defendant as relevant conduct for purposes of Section 1B1.3 of the sentencing guidelines.

The parties agree that the proper calculation for loss in this case is the amount mailed in the 48 packages picked up by the defendant, associated shipping fees, and the attempted mailings which were to be picked up by the defendant, which amounts to $1,135,980,12.

## VI.    ADVISORY GUIDELINE CALCULATION

The parties understand that the imposition of a sentence in this matter is governed by 18 U.S.C. § 3553. In determining the particular sentence to be imposed, the Court is required to consider seven factors. One of those factors is the sentencing range computed by the Court under advisory guidelines issued by the United States Sentencing Commission. In order to aid the Court in this regard, the parties set forth below their estimate of the advisory guideline range called for by the United States Sentencing Guidelines. To the extent that the parties disagree about the guideline computations, the recitation below identifies the matters which are in dispute.

The Guideline calculation below is the good-faith estimate of the parties, but it is only an estimate.  Although the government is obligated to make the sentencing recommendation tied to an offense level of 21, as set forth in the section below, the parties understand that the parties have an independent obligation to assist the Court in making an accurate determination of the correct guideline range.  To that end, the parties may argue that facts identified in the presentence report, or otherwise identified during the sentencing process, affect the estimate below.

a)  The parties agree that the applicable guideline is §2S1.1(a)(2) and that under §2S1.1(a)(2), the base offense level is **8** plus the number of the offense levels from the table in §2B1.1 corresponding to the value of the laundered funds. [3]   The parties agree that there is a 14-level increase based on more than $550,000, but less than $1.5 million.  The adjusted offense level is therefore **22**.

b)  Pursuant to §2S1.1(b)(2)(B), the specific offense characteristic requires an increase of **2** levels because the defendant is convicted under 18 U.S.C. § 1956.

---

[3] *See* §2S1.1 App. N. 2(B)("[t]he fact that the defendant was involved in laundering criminally derived funds after the commission of the underlying offense, without additional involvement in the underlying offense, does not establish that the defendant committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused the underlying offense," such that §2S1.1(a)(1) would apply); *see United States v. Glass,* 189 F. App'x 788, 795 (10th Cir. 2006) (§2S1.1 distinguishes "between 'direct money launderers' and 'third-party money launderers,'" citing U.S.S.G. Supp. to App. C, Amend. 634, at 227-28 (2001)).  "Direct money launderers are those who also commit the crime that produces the illicit funds, whereas third-party money launderers have no involvement in the underlying offense – they only launder the money generated from that offense." *Glass,* 189 F. App'x at 795 (citing U.S.S.G. Supp. to App. C, Amend. 634 at 228).  "Section 2S1.1(a)(1), which often produces a higher sentence than subsection (a)(2), was intended to apply to direct money launderers; subsection (a)(2) was intended to apply to less-culpable third-party launderers." *Glass,* 189 F. App'x at 795-96; *United States v. Blackmon*, 557 F.3d 113, 119 (3d Cir. 2009) (same).

c)      Because this guideline is calculated pursuant to § 2S1.1(a)(2), there are no victim-related adjustments.  There are no role-in-offense, obstruction, grouping, and/or multiple-count adjustments.

d)      The adjusted offense level is therefore **24.**

e)      The parties agree at this time the defendant should be afforded a **3-**level reduction for acceptance of responsibility. The resulting total offense level is **21**.

f)      The parties understand that the defendant's criminal history computation is tentative and based on the defendant's prior convictions.  The parties believe the defendant is in criminal history category is I.

g)      The career offender/criminal livelihood/armed career criminal adjustments do not apply.

h)      The advisory guideline range resulting from these calculations is **37-46** months.  However, in order to be as accurate as possible, with the criminal history category undetermined at this time, the offense level(s) estimated above could conceivably result in a range from **37** months (bottom of Category I) to **96** months (top of Category VI).  The guideline range would not exceed, in any case, the cumulative statutory maximums applicable to the counts of conviction.

i)      Pursuant to guideline § 5E1.2, assuming the estimated offense level above is correct, the fine range for this offense would be $15,000 to $150,00, plus applicable interest and penalties.

j)      Pursuant to guideline § 5D1.2, if the Court imposes a term of supervised release, that term is not more than 3 years.

k)      The defendant agrees to pay restitution to the victims of this offense with the exact amount to be determined prior to sentencing.

The parties understand that the Court is free, upon consideration and proper application of all 18 U.S.C. § 3553 factors, to impose that reasonable sentence which it deems appropriate in the exercise of its discretion and that such sentence may be less than that called for by the advisory guidelines (in length or form), within the advisory

guideline range, or above the advisory guideline range up to and including imprisonment for the statutory maximum term, regardless of any computation or position of any party on any 18 U.S.C. § 3553 factor.

## VII.   ENTIRE AGREEMENT

The agreement disclosed to the Court is the entire agreement. There are no other promises, agreements or "side agreements," terms, conditions, understandings, or assurances, express or implied. In entering this agreement, neither the government nor the defendant has relied, or is relying, on any other terms, promises, conditions or assurances.

Date: 11-2-2022

James Albert Witte
Defendant

Date: 11-2-2022

Martha H. Eskesen, Esq.
Attorney for Defendant

Date: 11/2/2022

Martha A. Paluch
Assistant U.S. Attorney